KAYE SCHOLER LLP
PAMELA J. YATES, Bar Number 137440
PAUL GELB, Bar Number 214439
BETSY L. KATZ, Bar Number 229194
1999 Avenue of the Stars, Suite 1700
Los Angeles, California  90067
Telephone:  (310) 788-1000
Facsimile:  (310) 788-1200

Attorneys for Defendants
PFIZER INC., PHARMACIA & UPJOHN
LLC and GREENSTONE LTD.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| ELIZABETH HOLDEN and DON HOLDEN, <br><br> Plaintiffs, <br><br> vs. <br><br> WYETH PHARMACEUTICALS, INC.; WYETH-AYERST PHARMACEUTICALS, INC.; WYETH-AYERST INTERNATIONAL, INC.; WYETH LABORATORIES, INC.; WYETH PHARMACEUTICALS; WYETH, INC.; PHARMACIA & UPJOHN, INC.; PFIZER, INC.; BARR LABORATORIES, INC.; GREENSTONE LTD.; MICHELLE LUNA; and DOES 1 through 100, inclusive, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CASE NO._____ <br><br> **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441** |

KAYE SCHOLER LLP

1   TO:     THE CLERK OF THE COURT:

2           Pursuant to 28 U.S.C. § 1441, defendants PFIZER INC., PHARMACIA & UPJOHN LLC

3   (incorrectly named as Pharmacia & Upjohn, Inc.), and GREENSTONE LTD. (the "Removing

4   Defendants") hereby remove this action, *Holden v.Wyeth Pharmaceuticals, Inc., et al.* (Case No.

5   CGC-05-441164, Superior Court, County of San Francisco, California) to the United States District

6   Court for the Northern District of California, and allege as follows:

7           1.      This action is brought by Plaintiffs for injuries allegedly arising from treatment with

8   hormone replacement therapy ("HRT") medications.  Plaintiffs seek compensatory and

9   punitive/exemplary damages.  Specifically, Plaintiffs allege claims for fraudulent concealment,

10  negligence, fraud, negligent misrepresentation, and breach of express warranty.

11          2.      There is jurisdiction over this removed action pursuant to 28 U.S.C. § 1441 because

12  this action originally could have been filed in this Court pursuant to 28 U.S.C. § 1332.  Specifically,

13  this Court has subject matter jurisdiction over this action because there is the requisite diversity of

14  citizenship between the plaintiff and the defendants, and the amount in controversy exceeds $75,000,

15  exclusive of interest and costs.

16                  I.  **JURISDICTIONAL BASIS FOR REMOVAL**

17  **A.      Diversity of Citizenship.**

18          3.      There is diversity of citizenship in this action because Wyeth (incorrectly named as

19  "Wyeth, Inc."), Wyeth Pharmaceuticals Inc., Wyeth-Ayerst International, Inc. (collectively the

20  "Wyeth Defendants")[1], Pharmacia & Upjohn LLC (incorrectly named as Pharmacia & Upjohn, Inc.),

21  Pfizer Inc., Barr Laboratories, Inc., and Greenstone Ltd. are diverse from Plaintiffs, and, as shown

22  below, Michelle Luna is fraudulently joined.

---

24  [1] Plaintiffs also name Wyeth-Ayerst Pharmaceuticals Inc. (incorrectly named as Wyeth-Ayerst
25  Pharmaceuticals, Inc.), Wyeth Laboratories Inc. (incorrectly named as Wyeth Laboratories, Inc.), and
    Wyeth Pharmaceuticals as defendants.  Wyeth-Ayerst Pharmaceuticals Inc. and Wyeth Laboratories
26  Inc. are predecessors to Wyeth Pharmaceuticals Inc. and no longer exist as separate corporate
    entities.  On December 31, 1998, Wyeth Laboratories Inc. was merged into an entity that eventually
27  became Wyeth Pharmaceuticals Inc.  Wyeth-Ayerst Pharmaceuticals Inc. changed its name to Wyeth
    Pharmaceuticals Inc. on March 22, 2002.  Wyeth Pharmaceuticals is an unincorporated division of
28  Wyeth.

KAYE SCHOLER LLP

1

1    4.      Plaintiffs are, and at the time of the filing of this action were, citizens of the State of

2  California.  [Complaint for Damages ("Compl."), attached as Exhibit A, ¶ 3.]

3    5.      Defendant Wyeth Pharmaceuticals Inc. is, and at the time of filing of this action was,

4  a corporation existing under the laws of the State of New York, having its principal place of business

5  in the State of Pennsylvania.

6    6.      Defendant Wyeth-Ayerst International, Inc. is, and at the time of filing of this action

7  was, a corporation existing under the laws of the State of New York, having its principal place of

8  business in the State of Pennsylvania.

9    7.      Defendant Wyeth (incorrectly named as "Wyeth, Inc.") is, and at the time of filing of

10  this action was, a corporation existing under the laws of the State of Delaware, having its principal

11  place of business in the State of New Jersey.

12    8.      Pharmacia & Upjohn LLC is, and at the time of the filing of this action was, a limited

13  liability company whose sole member is, and at the time of the filing of this action was, Pharmacia

14  Corporation.  Thus, Pharmacia & Upjohn LLC has the same citizenship for purposes of federal

15  diversity jurisdiction as Pharmacia Corporation.  Pharmacia Corporation is, and at the time of the

16  filing of the action was, a Delaware Corporation with its principal place of business in the State of

17  New Jersey.

18    9.      Defendant Pfizer Inc. is, and at the time of filing of this action was, a corporation

19  existing under the laws of the State of Delaware, having its principal place of business in the State of

20  New York.

21    10.     Defendant Barr Laboratories, Inc. is, and at the time of filing of this action was, a

22  corporation existing under the laws of the State of Delaware, having its principal place of business in

23  the State of New Jersey.

24    11.     Defendant Greenstone Ltd. is, and at the time of filing of this action was, a

25  corporation existing under the laws of the State of Delaware, having its principal place of business in

26  the State of New Jersey.

27    12.     Pursuant to the allegations in the Complaint, Defendant Michelle Luna (the

28  "Individual Defendants") is, and at the time of filing of this action was, citizens of the State of

KAYE SCHOLER LLP

2

1  California. [Compl., ¶ 30.]  However, the Individual Defendants are fraudulently joined.  Thus,

2  their citizenship must be disregarded in determining jurisdiction.

3      13.    The Complaint purports to state claims against unnamed, fictitious defendants

4  identified as "DOES 1 through 100."  For purposes of removal, "the citizenship of defendants sued

5  under fictitious names shall be disregarded."  28 U.S.C. § 1441(a).

6      14.    Accordingly, the requisite complete diversity among the parties for federal

7  jurisdiction is satisfied.

8  **B.    Applying the Fraudulent Joinder Doctrine, Complete Diversity Exists.**

9      15.    The doctrine of fraudulent joinder prevents Plaintiffs from defeating federal diversity

10  jurisdiction simply by naming in-state defendants.  In determining whether there is complete

11  diversity, a court must disregard the citizenship of those defendants where "plaintiff fails to state a

12  cause of action against a resident defendant, and the failure is obvious according to the settled rules

13  of the state. . . ."  *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987).  As a

14  leading California treatise explains, the standard to be applied in this Circuit in determining whether

15  an in-state defendant is fraudulently joined is whether there is a "reasonable basis for imposing

16  liability" against that defendant.  *See 1 W. Schwarzer and A.W. Tashima, California Practice Guide:*

17  *Federal Civil Procedure Before Trial (2003)* at ¶ 2:672.

18      16.    As set forth below, the Individual Defendants are fraudulently joined and should be

19  disregarded in determining that there is federal diversity jurisdiction over this action.

20  **C.    The Allegations Against The Individual Defendants Do Not Support Any Causes Of**

21  **Action Against Them.**

22      17.    The allegations directed toward the Individual Defendants do not support any causes

23  of action against them.  The Complaint alleges causes of action against the Individual Defendants for

24  fraudulent concealment, fraud, and negligent misrepresentation.  [Compl., ¶¶ 114-126, 175-198.]

25      18.    However, the Complaint fails to plead the factual events supporting the causes of

26  action for fraud and negligent misrepresentation with particularity.

27      **Fraud and Fraudulent Concealment.**

28      19.    Claims for fraud and fraudulent concealment must be alleged with particularity in the

KAYE SCHOLER LLP

3

1  Complaint.  As Professor Witkin explains in *California Procedure*, 4th ed. vol. 5, Pleadings, section

2  669:

> Fraud actions have been classed as "disfavored," and are subject to strict requirements
>
> of particularity in pleading.  The idea seems to be that allegations of fraud involve a
>
> serious attack on character, and fairness to the defendant demands that he should
>
> receive the fullest possible details of the charge in order to prepare his defense.
>
> Accordingly, the rule is everywhere followed that fraud must be specifically pleaded.
>
> The effect of this rule is twofold:  (1) General pleading of the legal conclusion of
>
> "fraud" is insufficient; the facts constituting the fraud must be alleged;  (2) every
>
> element of the cause of action for fraud must be alleged in the proper manner (i.e.,
>
> factually and specifically), and the policy of liberal construction of the pleadings will
>
> not ordinarily be invoked to sustain a pleading defective in any material respect. . . .
>
> F.R. Civ. P., Rule 9(b) also requires particularity. . .

14  20.    Pleading with particularity means setting forth specific *facts*, not simply re-hashing

15  boilerplate that is generic and identical to every complaint filed.  As California's Supreme Court held

16  in *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996), "[t]his particularity requirement necessitates

17  pleading *facts* which show how, when, where, to whom, and by what means the representations were

18  tendered." (Emphasis in original, citation and internal quotation marks omitted).

19  21.    Indeed, MDL courts in other litigations concerning pharmaceutical products have

20  denied remand where, as here, the Complaint asserts fraud claims against sales representatives but

21  fail to allege the "time and place of particular representations."  *In re Rezulin Prods. Liab. Litig.*, 133

22  F. Supp. 2d 272, 283 (S.D.N.Y. 2001) ("*Rezulin*").  Similarly, Judge Bartle in the Diet Drug MDL

23  held that sales representatives were fraudulently joined where plaintiffs' allegations fell "far short of

24  what is required under [Rule 9(b)]."  *In re Diet Drugs*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002).

25  22.    The Complaint here fails to allege specific facts to support its conclusory allegations.

26  Indeed, the Rezulin MDL judge has held that territory representatives were fraudulently joined

27  where, as here, plaintiffs asserting claims against territory representatives failed to sufficiently allege

28  the "time and place of particular representations." *Rezulin*, 133 F. Supp. 2d at 283.  Those

KAYE SCHOLER LLP

4

1  "allegations do not meet the Rule 9(b) requirements." *Id.* at 284.

2       23.    Moreover, the Complaint fails to allege "facts giving rise to a strong inference of

3  scienter," as required for fraud claims. *See In re Rezulin*, PTO-156, 2003 WL 21396744, at *4

4  (emphasis in original) (denying remand in action naming in state representatives).

5       24.    Accordingly, since this Complaint fails to allege fraud or fraudulent concealment

6  against the Individual Defendants with particularity, it fails to state any such causes of action against

7  them.

8      **Negligent Misrepresentation**.

9       25.    The Complaint also fails to state a negligent misrepresentation claim against the

10  Individual Defendants.

11       26.    California's Supreme Court, in *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 184

12  (2003), stated that a claim for negligent misrepresentation must be alleged with particularity, as

13  "implied in the reasoning of two decisions, *Committee on Children's Television, Inc. v. General*

14  *Foods Corp.*, 35 Cal. 3d 197, 216 (1983), and *B.L.M. v. Sabo & Deitsch*, 55 Cal. App. 4th 823,

15  835-837 (1997)."

16       27.    Just as this Complaint fails to allege the fraud claims against the Individual

17  Defendants with particularity, it also fails to do so with respect to the negligent misrepresentation

18  claims. Also, the allegations that the Individual Defendants "knew or should have known" (Compl.

19  ¶ 190) are unsupported and wholly conclusory. As *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F.

20  Supp. 2d 1089, 1102 (C.D. Cal. 2002), held, in evaluating whether a non-diverse defendant was

21  fraudulently joined, the court only considers "non-conclusory factual allegations in the complaint as

22  true."

23       28.    Moreover, the Rezulin MDL court further held that a misrepresentation claim that in

24  "substance . . . charge[s] fraud" (even if plaintiff has denominated such a claim as one for "negligent

25  misrepresentation") is subject to the same pleading requirements. *Rezulin*, 133 F. Supp. 2d at 285.

26       29.    Likewise, the Diet Drug MDL recently denied remand in actions naming sales

27  representatives, where, as here, plaintiffs alleged "negligence and negligent/reckless

28  misrepresentation by marketing the 'unreasonably dangerous subject drugs' as safe to the consuming

KAYE SCHOLER LLP

5

1    public, 'including, but not limited to, plaintiffs and plaintiff's physicians.'" *In re Diet Drugs*, 294 F.

2    Supp. 2d at 677 (emphasis omitted).

3    **D.    Alternatively, This Court Could "Drop" The Non-Diverse Defendants Under Fed. R.**

4    **Civ. P. 21 To Perfect Its Diversity Jurisdiction.**

5          30.      Removal is proper for another independent reason.  Pursuant to Fed. R. Civ. P. 21, a

6    federal court "may perfect diversity by dropping a non-diverse and dispensable party at any time."

7    *Williams v. Knoll Pharms.*, No. 5:03CV8030, slip op. at 5 (N.D. Ohio, July 2003).  This Court

8    should "drop" the non-diverse defendants to perfect its diversity jurisdiction.

9    **E.    Amount In Controversy.**

10         31.      The amount in controversy in this case exceeds $75,000, excluding interest and costs.

11   A defendant can establish the amount in controversy by the allegations of a complaint.  *See Conrad*

12   *Associates v. Hartford Accident & Indemnity Company*, 994 F. Supp. 1196, 1198 (N.D. Cal. 1998).

13   The Complaint alleges injuries caused by breast cancer.  [Compl., ¶ 111.]  Reported verdicts and

14   settlements in cases where the alleged injury is breast cancer indicate that damages in such cases

15   exceed $75,000.  *See, e.g., Rozar v. Kaiser Foundation Healthcare*, 21 No. 8 Verdict Settlement &

16   Tactics ("VST") 348 (Westlaw 2000) ($842,680 arbitration award for delay in diagnosing breast

17   cancer); *Howstow v. Rosenburg*, 21 No. 2 VST 65 (Westlaw 2000) ($750,000 verdict in suit alleging

18   failure to diagnose breast cancer); *Mathews v. Bloy*, 19 No. 4 VST 141 (Westlaw 1999) ($400,000

19   awarded in suit alleging failure to diagnose breast cancer); *Ruffin v. Medical Ctr. Radiology Group*,

20   15 No. 7 VST 238 (Westlaw 1995) ($2.6 million awarded to plaintiff in suit alleging failure to

21   diagnose breast cancer); *Greeley v. Slepian*, 12 No. 8 VST 280 (Westlaw 1992) ($1.4 million

22   arbitration award for failure to diagnose breast cancer).

23         32.      Moreover, federal courts have held that requisite amounts in controversy can be

24   established from "other evidence in the record," including similar complaints that have been

25   removed and transferred to an MDL.  *Rezulin I* at 296 (defendants met burden of establishing amount

26   in controversy because other complaints in that MDL alleged sufficient damages for similar injuries);

27   *In re Norplant Contraceptive Products Liability Litigation*, 918 F. Supp. 178, 180 (E.D. Tex. 1996)

28   (damages exceeded the requisite amount because, in part, the case involved injuries alleged in

KAYE SCHOLER LLP

6

1  | numerous other Norplant cases currently pending in the court under MDL).

2  |     Several similarly pleaded complaints alleging similar injuries from HRT medications have

3  | been removed to this District Court. *See, e.g., Karen Erdman v. Wyeth Pharmaceuticals, et al.*, Case

4  | No. SACV-03-1736 JVS (MLGx) (C.D. Cal. Dec. 3, 2003); *Sally Hamilton v. Wyeth*

5  | *Pharmaceuticals, et al.*, Case No. SACV-03-1737 AHS (ANx) (C.D. Cal. Dec. 3, 2003); *Arnold*

6  | *Klein, Individually and as Personal Representative of the Estate of Yvette Klein, deceased v. Wyeth,*

7  | *et al.*, Case No. CV-04-1920 DT (AJWx) (C.D. Cal. Mar. 19, 2004); *Margaret Rosen v. Wyeth*

8  | *Pharmaceuticals, Inc., et al.*, Case No. CV-04-7182 DT (MANx) (C.D. Cal. Aug. 27, 2004);

9  | *Mildred Rimmer v. Wyeth Pharmaceuticals, Inc., et al.*, Case No. CV-04-3822 RS (ADR) (N.D. Cal.

10 | Sept. 10, 2004).

11 |     33.    Furthermore, the Complaint includes a prayer for punitive and exemplary damages.

12 | [*Id.*, Prayer.] Federal courts "routinely have held that unspecified claims for punitive damage

13 | sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out

14 | in 28 U.S.C. § 1332." *Ross v. First Family Fin. Servs.,Inc.*, 2002 U.S. Dist. LEXIS 23212 at *27

15 | (N.D. Miss. Aug. 29, 2002) (citations omitted). For this additional reason, the requisite amount in

16 | controversy for diversity jurisdiction is satisfied.

17 | ## II. PROCEDURAL REQUIREMENTS FOR REMOVAL

18 |     34.    On May 10, 2005, Plaintiffs filed their Complaint, a copy of which is attached as

19 | Exhibit A. The Removing Defendants were served with the Complaint on May 25, 2005. Upon

20 | information and belief, the Wyeth Defendants were served with the Complaint on May 25, 2005.

21 | Upon information and belief, Barr Laboratories was served with the Complaint on June 1, 2005.

22 | This Notice of Removal is timely under 28 U.S.C. § 1446(b).

23 |     35.    Copies of other process and pleadings are attached to this Notice of Removal as

24 | Exhibit B.

25 |     36.    As reflected in Exhibit C, the Wyeth Defendants and Defendant Barr Laboratories

26 | consent to the removal of this action. The Individual Defendants, as shown above, are fraudulently

27 | joined. Moreover, upon information and belief, the Individual Defendants have not been served.

28 | Accordingly, the Individual Defendants' consent is not required.

KAYE SCHOLER LLP

7

37.     The United States District Court for the Northern District of California embraces the county in which the state court action is now pending, and thus, this Court is a proper venue for this action pursuant to 28 U.S.C. § 84.  This case is assigned to this Division pursuant to Civil Local Rule 3-2.

38.     In the United States District Court for the Eastern District of Arkansas there is a multidistrict litigation ("MDL") established by the Judicial Panel on Multidistrict Litigation (the "Panel") for the efficient handling of actions arising from the treatment with HRT medication.  *In re Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366 (J.P.M.L. 2003).  The Honorable William Wilson, United States District Judge for the Eastern District of Arkansas, was designated the transferee judge by the Panel for this MDL proceeding.  The Panel will be notified, pursuant to 28 U.S.C. § 1407, that this action is a "tag-along" case that should be transferred to the MDL proceeding.

39.     The Removing Defendants are filing written notice of this removal with the Clerk of the State Court in which the action is currently pending pursuant to 28 U.S.C. § 1446(d).  Copies of Notice to Adverse Party of Removal to Federal Court, together with this Notice of Removal, are being served upon Plaintiffs' counsel pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, the Removing Defendants respectfully remove this action from the Superior Court of the State of California, County of San Francisco, to this Court, pursuant to 28 U.S.C. § 1441.


Dated: June 15, 2005                    Respectfully submitted,

                                        KAYE SCHOLER LLP


                                        By: _____
                                            Betsy Katz
                                        Attorneys for Defendants
                                        PFIZER INC., PHARMACIA & UPJOHN LLC
                                        and GREENSTONE LTD.

KAYE SCHOLER LLP

**EXHIBIT A**

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

Gary M. Paul (State Bar No. 62367)
Mary E. Alexander (State Bar No. 104173)

Attorneys for ___Plaintiffs___

**ENDORSED**
**F I L E D**
San Francisco County Superior Court

MAY 1 0 2005

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

PLAN I   OCT 0 7 2005   9:00 AM

DEPARTMENT 212

PAUL & JANOFSKY

MAY 1 6 '05

RECEIVED

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ELIZABETH HOLDEN and DON HOLDEN,<br><br>Plaintiffs,<br><br>v.<br><br>WYETH PHARMACEUTICALS, INC.; WYETH-AYERST PHARMACEUTICALS, INC.; WYETH-AYERST INTERNATIONAL, INC.; WYETH LABORATORIES, INC.; WYETH PHARMACEUTICALS; WYETH, INC.; PHARMACIA & UPJOHN, INC.;PFIZER, INC.; BARR LABORATORIES, INC.; GREENSTONE LTD.; MICHELLE LUNA; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO.  CGC 05 441164<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1.  **Fraudulent Concealment;**<br>2.  **Fraudulent Concealment;**<br>3.  **Negligence;**<br>4.  **Negligence;**<br>5.  **Fraud;**<br>6.  **Fraud;**<br>7.  **Fraud;**<br>8.  **Negligent Misrepresentation;**<br>9.  **Breach of Express Warranty;**<br>10.  **Breach of Express Warranty; and**<br>11.  **Loss of Consortium**<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW Plaintiffs, Elizabeth Holden and Don Holden, and for causes of action against the defendants, and each of them, complain and allege as follows:

I.

## GENERAL ALLEGATIONS

1.    The true names and/or capacities, whether individual, corporate, associate,

- 1 -

COMPLAINT FOR DAMAGES

COPY

governmental or otherwise of Defendants DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names and will amend this Complaint to show their true names and/or capacities when the same has been ascertained.  The Plaintiffs are informed and believe, and thereupon allege, that each Defendant designated herein as a DOE was responsible, negligently or in some other actionable manner for the events and happenings referred to herein which legally caused the injuries and damages to Plaintiffs as hereinafter alleged.

2.      Plaintiffs are informed and believe and thereupon allege that at all times mentioned herein, Defendants, and each of them, were the agents, servants, employees and/or consultants of their co-Defendants and were, as such, acting within the course, scope and authority of said agency and/or employment, and that each and every Defendant as aforesaid, when acting as the principal, was negligent in the selection and hiring of each and every other Defendant as an agent, servant, employee and/or assistant.

3.      All times mentioned herein, Plaintiffs were and now are citizens of the State of California and were and now are residents of the County of Sonoma.

4.      Plaintiffs brings this action to recover damages for personal injuries against Defendants Wyeth Pharmaceuticals, Inc., Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth-Ayerst International, Inc., Wyeth Laboratories, Inc., Wyeth Pharmaceuticals, Wyeth, Inc., and DOES 51 through 75, inclusive, and each fo them, which tested, manufactured, marketed, labeled, distributed, promoted, and sold Premarin, Prempro, Premphase, and medroxyprogesterone acetate (a synthetic equivalent of the hormone progestin).  These defendants shall herein be referred to collectively as the "Wyeth Defendants."

5.      Plaintiffs also bring this action against Defendants Pharmacia & Upjohn, Inc., Pfizer, Inc., Barr Laboratories, Inc., Greenstone Ltd., and DOES 76 through 100, inclusive, and each of them, which tested, manufactured, marketed, labeled, distributed, promoted, and sold medroxyprogesterone acetate.  These defendants shall herein be referred to collectively as the "Medroxyprogesterone Acetate Defendants" or "MPA Defendants."

- 2 -

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 201
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 456-7900
FACSIMILE (310) 458-6823

6.      Plaintiffs also bring this action against Defendant Michelle Luna, and DOES 1 through 50, inclusive, and each of them, who, the Plaintiffs are informed and believe and therefore allege, were responsible for the solicitation, marketing, and promotion of Premarin, Prempro, Premphase, and medroxyprogesterone acetate to Plaintiff Elizabeth Holden and her physicians. These defendants shall herein be referred to collectively as the "Individual Defendants."

7.      Among the most prescribed hormone therapy drugs for post-menopausal women is the Wyeth Defendants' product, Prempro, which is also known by its pharmaceutical name, conjugated equine estrogens/medroxyprogesterone acetate (progestin). Prempro is considered a combination hormone therapy because it contains a combination of two hormones, estrogen and progestin. The Wyeth Defendants' product, Premphase, is very similar to Prempro, containing a combination of estrogen and progestin. However, instead of providing estrogen and progestin every day, as the Prempro tablet does, Premphase provides estrogen every day while the progestin is added to the pill only for the last two weeks of the menstrual cycle. This is done so that Premphase hormone regime resembles the normal menstrual cycle.

8.      Estrogen therapy refers to use of estrogen alone for hormone therapy. Among the most prescribed brands of estrogen is the Wyeth Defendants' product, Premarin, which is also known by its pharmaceutical name, conjugated equine estrogens.

9.      In addition to manufacturing the hormone therapy drugs, Premarin, Premarin, and Premphase, the Wyeth Defendants along with the MPA Defendants manufactured and distributed another hormone drug, medroxyprogesterone acetate, which is a synthetic progestin that when taken concurrently with Premarin constitutes a form of combination hormone therapy that is pharmaceutically equivalent to the Prempro tablet.

10.     On July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a federal agency and part of the National Institutes of Health ("NIH"), halted a major clinical trial studying the risks and benefits of hormone therapy involving estrogen and progestin in healthy post-menopausal women. The drug used during the trial was Prempro, which

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

COMPLAINT FOR DAMAGES

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 Ocean Avenue, Suite 200
Santa Monica, CA 90401-2103
Telephone (310) 458-7900
Facsimile (310) 458-6823

1   was supplied by the Wyeth Defendants. The 16,600-patient study was abruptly halted after

2   researchers said the risks of taking Prempro outweighed its benefits.

3         11.      The July 2002 Prempro study came after decades of marketing efforts by the

4   Wyeth Defendants to promote the notion that long-term use of hormone therapy-either as

5   combination estrogen and progestin therapy (e.g., Prempro) or estrogen alone (e.g.,

6   Premarin)-could provide cardiovascular benefits to women and make women look and feel

7   "feminine forever." The study revealed that long-term use of hormone therapy *increased*

8   the risk of cardiovascular disease as well as the risk of invasive breast cancer, pulmonary

9   embolism, blood clots, stroke, and heart attack.

10         12.      Almost simultaneously, another significant study from researchers at the

11   National Cancer Institute ("NCI") reported that women who use long-term estrogen therapy

12   (e.g., Premarin) are at a significantly increased risk of developing ovarian cancer.

13         13.      Immediately following the announcement of the findings of both studies, sales

14   of Prempro and Premarin plummeted as physicians and patients alike learned that the

15   marketing message - promoted by the Wyeth Defendants, the MPA Defendants and DOES

16   51 through 100 - extolling the safety and efficacy of hormone therapy was false. In

17   particular, these studies finally exposed the true nature of the Wyeth Defendants

18   decades-long marketing effort to promote hormone therapy as a safe and effective

19   long-term drug regimen for post-menopausal women: for decades the Wyeth Defendants

20   have been profiting from a misguided and fraudulent campaign that endangered the health

21   and lives of millions of American women.

22                                        **II.**

23                            **PARTIES**

24         14.      Defendant Wyeth Pharmaceuticals, Inc., is a New York corporation with a

25   principal place of business at 555 East Lancaster Avenue, St. Davids, Pennsylvania. At

26   all times relevant hereto, Wyeth Pharmaceuticals, Inc., was engaged in, inter alia, the

27   business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling

28   hormone therapy drugs, including Premarin, Prempro, Premphase, and

medroxyprogesterone acetate.  Plaintiffs allege on information and belief that Wyeth Pharmaceuticals, Inc., does business in the State of California and in Los Angeles County, and, at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold the drugs Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

15.   Defendant Wyeth-Ayerst Pharmaceuticals, Inc. is a New York corporation with a principal place of business at 555 East Lancaster Avenue, St. Davids, Pennsylvania. At all times relevant hereto, Wyeth-Ayerst Pharmaceuticals Inc. was engaged in, inter alia, the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate. Plaintiffs allege on information and belief that Wyeth-Ayerst Pharmaceuticals Inc. does business in the State of California and in Los Angeles County, and, at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold the drugs Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

16.   Defendant Wyeth Ayerst International Inc. is a New York corporation with a principal place of business at Philadelphia, Pennsylvania.  At all times relevant hereto, Wyeth Ayerst International, Inc., was engaged in, inter alia, the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate. Plaintiffs allege on information and belief that Wyeth Ayerst International, Inc. does business in the State of California and in Los Angeles County, and, at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold the drugs Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

17.   Defendant Wyeth Laboratories, Inc. is a New York corporation with a principal place of business at 1300 Wolf Street, Philadelphia, Pennsylvania.  At all times relevant hereto, Wyeth Laboratories, Inc. was engaged in, inter alia, the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 306
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7300
FACSIMILE (310) 458-6823

- 5 -

1   drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

2   Plaintiffs allege on information and belief that Wyeth Laboratories, Inc., does business in

3   the State of California and in Los Angeles County, and, at all times relevant hereto, it

4   tested, manufactured, labeled, marketed, distributed, promoted, and sold the drugs

5   Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

6           18.     Defendant Wyeth Pharmaceuticals is a Pennsylvania corporation

7   headquartered and with a principal place of business at 500 Arcola Drive, Collegeville,

8   Pennsylvania. At all times relevant hereto, Wyeth Pharmaceuticals was engaged in, inter

9   alia, the business of testing, manufacturing, labeling, marketing, distributing, promoting,

10  and selling hormone therapy drugs, including Premarin, Prempro, Premphase, and

11  medroxyprogesterone acetate.  Plaintiffs allege on information and belief that Wyeth

12  Pharmaceuticals does business in the State of California and in Los Angeles County, and,

13  at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed,

14  promoted, and sold the drugs Premarin, Prempro, Premphase, and medroxyprogesterone

15  acetate.

16          19.     Defendant Wyeth, Inc., is a Delaware corporation headquartered and with

17  a principal place of business at 5 Giralda Farms, Madison, New Jersey.  At all times

18  relevant hereto, Wyeth, Inc., was engaged in, inter alia, the business of testing,

19  manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy

20  drugs, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate.

21  Plaintiffs allege on information and belief that Wyeth, Inc., does business in the State of

22  California and in Los Angeles County, and, at all times relevant hereto, it tested,

23  manufactured, labeled, marketed, distributed, promoted, and sold the drugs Premarin,

24  Prempro, Premphase, and medroxyprogesterone acetate.

25          20.     MPA Defendant Pharmacia & Upjohn, Inc., is a Delaware corporation

26  headquartered and with a principal place of business at 100 Route 206 North, Peapack,

27  New Jersey. At all times relevant hereto, Pharmacia & Upjohn, Inc., was engaged in, inter

28  alia, the business of testing, manufacturing, labeling, marketing, distributing, promoting,

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 Ocean Avenue, Suite 300
Santa Monica, CA 90401-2103
Telephone (310) 458-7900
Facsimile (310) 458-8603

- 6 -

1  and selling hormone therapy drugs, including medroxyprogesterone acetate. Plaintiffs

2  allege on information and belief that Pharmacia & Upjohn, Inc., does business in the State

3  of California and in Los Angeles County, and, at all times relevant hereto, it tested,

4  manufactured, labeled, marketed, distributed, promoted, and sold the drug

5  medroxyprogesterone acetate.

6      21.    MPA Defendant Pfizer Inc. is a Delaware corporation headquartered and with

7  a principal place of business at 235 East 42nd Street, New York, New York. At all times

8  relevant hereto, Pfizer Inc. was engaged in, inter alia, the business of testing,

9  manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy

10  drugs, including medroxyprogesterone acetate. Plaintiffs allege on information and belief

11  that Pfizer Inc. does business in Pennsylvania and in Philadelphia County and, at all times

12  relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold

13  the drug medroxyprogesterone acetate.

14      22.    MPA Defendant Barr Laboratories, Inc., is a New York corporation

15  headquartered and with a principal place of business at 2 Quaker Road, Pomona, New

16  York. At all times relevant hereto, Barr Laboratories, Inc., was engaged in, inter alia, the

17  business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling

18  hormone therapy drugs, including medroxyprogesterone acetate. Plaintiffs allege on

19  information and belief that Barr Laboratories, Inc., does business in Pennsylvania and in

20  Philadelphia County and, at all times relevant hereto, it tested, manufactured, labeled,

21  marketed, distributed, promoted, and sold the drug medroxyprogesterone acetate.

22      23.    MPA Defendant Greenstone Ltd. is a Delaware corporation headquartered

23  and with a principal place of business at 7000 Portage Road, Kalamazoo, Michigan. At all

24  times relevant hereto, Greenstone Ltd. was engaged in, inter alia, the business of testing,

25  manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy

26  drugs, including medroxyprogesterone acetate. Plaintiffs allege on information and belief

27  that Greenstone Ltd. does business in Pennsylvania and in Philadelphia County and, at

28  all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted,

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 209
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

1  and sold the drug medroxyprogesterone acetate.

2     24.    Plaintiffs allege on information and belief that the following companies and

3  others not yet identified manufactured and/or distributed and/or promoted medroxy-

4  progesterone acetate and other progestins and that <u>Plaintiff may have ingested the</u>

5  <u>progestin manufactured and/or distributed by one or more of them</u>: Apotheca Inc.; Barr

6  Laboratories Inc., Compumed; DRX Pharmaceutical Consultants Inc.; Duramed

7  Pharmaceuticals Inc.; Carnrick Laboratories Inc.; Fielding Pharmaceutical Company;

8  Greenstone Ltd.; <u>Kaiser FDN. Hospital, a California entity located in Livermore, California</u>;

9  Major Pharmaceuticals; Martec Pharmaceuticals Inc.; Mylan Laboratories Inc.; <u>Nucare</u>

10 <u>Pharmaceuticals Inc. located in Orange, California</u>; Parmed Pharmaceuticals Inc.; PD-RX

11 Pharmaceuticals Inc.; Pharma Pac; <u>Pharmedix, located in Hayward, California</u>; Physicians

12 Total Care Inc.; Qualitest Pharmaceuticals Inc.; Quality Care Pharmaceuticals Inc.; Quality

13 Care Products LLC; R.I.D. Inc.; Rosemont Pharmaceutical Corporation; Rugby

14 Laboratories Inc.; Southwood Pharmaceuticals Inc.; <u>Talbert Medical Management Corp.</u>

15 <u>located in Costa Mesa, California</u>; United Research Laboratories, Inc.; Upsher-Smith

16 Laboratories Inc.; Veratex Corp.; Warner Chilcott Inc.; and <u>Watson Pharmaceuticals Inc.,</u>

17 <u>a California Corporation, located in Corona, California</u>.

18     The above list is intended to include each company's subsidiaries, divisions,

19 franchises, partners, joint venturers, organizational units of any kind, their predecessors,

20 their successors and assigns, and their present officers, directors, employees, agents,

21 representatives and other persons acting on their behalf.

22     Plaintiffs will amend the Complaint and/or seek leave of the Court to amend the

23 Complaint to name as DOES any or all of these or other companies, once Plaintiffs have

24 discovered which company/companies manufactured and/or distributed the generic

25 progestins they ingested.

26     25.    Plaintiffs allege on information and belief that the following companies and

27 others not yet identified manufactured and/or distributed conjugated estrogens, and that

28 <u>Plaintiff may have ingested conjugated estrogens manufactured and/or distributed by them</u>:

- 8 -

1  Barr Laboratories Inc.; Comprehensive Consultant Services; DRX Pharmaceutical

2  Consultants Inc.; Duramed Pharmaceuticals Inc.; Pharmedix, located in Hayward,

3  California; and Talbert Medical Management Corp. located in Costa Mesa, California.

4       The above list is intended to include each company's subsidiaries, divisions,

5  franchises, partners, joint venturers, organizational units of any kind, their predecessors,

6  their successors and assigns, and their present officers, directors, employees, agents,

7  representatives and other persons acting on their behalf.

8       Plaintiffs will amend the Complaint or will seek leave of the Court to amend the

9  Complaint to name as DOES any or all of these or other companies, once Plaintiffs have

10  discovered which company/companies manufactured and/or distributed the Hormones they

11  ingested.

12       26.    Plaintiffs allege on information and belief that the following companies and

13  others not yet identified manufactured and/or distributed esterified estrogens, and that

14  Plaintiff may have ingested esterified estrogens manufactured and/or distributed by them:

15  Allscripts Healthcare Solutions; Apotheca Incorporated; Compumed; Direct Dispensing

16  Inc.; DRX Pharmaceutical Consultants Inc.; King Pharmaceuticals™, Inc.; Med Pro Inc.;

17  Monarch Pharmaceuticals; Murfreesboro Pharmaceutical Nursing Supply; Parke-Davis

18  (Wyeth); PD-RX Pharmaceuticals Inc.; Physicians Total Care; and Quality Care.

19       The above list is intended to include each company's subsidiaries, divisions,

20  franchises, partners, joint venturers, organizational units of any kind, their predecessors,

21  their successors and assigns, and their present officers, directors, employees, agents,

22  representatives and other persons acting on their behalf.

23       Plaintiffs will amend the Complaint or seek leave of the Court to amend the

24  Complaint to name as DOES any or all of these or other companies, once Plaintiffs have

25  discovered which company/companies manufactured and/or distributed the Hormones they

26  ingested.

27       27.    Plaintiffs allege on information and belief that the following companies and

28  others not yet identified manufactured and/or distributed estradiol, and that Plaintiff may

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 200
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

- 9 -

1   have ingested estradiol manufactured and/or distributed by them: 3M Pharmaceuticals Inc.;

2   Aaipharma Inc.; Allscripts Healthcare Solutions; Amerisource Health Services Corp. DBA

3   American Health Packaging AH; Apotheca Inc.; Apothecon; Barr Laboratories Inc.; Bristol

4   Meyers Squibb Laboratories Co.; Cheshire Pharmaceutical Systems; Compumed; Direct

5   Dispensing Inc.; DRx - The Doctor's Dispensing Network; DRX Pharmaceutical

6   Consultants Inc.; Duramed Pharmaceuticals Inc.; ESI Lederle Generics & Pharma;

7   Fielding; Galen; Geneva; Haines Pharmaceuticals; Kaiser FDN. Hospital, Livermore,

8   California; Major Pharmaceuticals Inc.; Martec Pharmaceuticals Inc.; Mylan Laboratories

9   Inc.; National Pharmpak Services Inc.; PD-Rx Pharmaceuticals Inc.; Pharma Pac;

10   Physician's Total Care Inc.; Prestige Packaging Inc.; Qualitest Pharmaceuticals Inc.;

11   Quality Care Pharmaceuticals Inc.; Repackaging Co. of America; Rugby Laboratories Inc.;

12   Rugby Lab Inc.; RX Pak Div. of McKesson HBOC; Sandoz; Teva Pharmaceuticals USA

13   Inc.; Watson Pharmaceuticals Inc. a California Corporation located in Corona, California;

14   and Zenith Goldline Pharmaceuticals.

15      The above list is intended to include each company's subsidiaries, divisions,

16   franchises, partners, joint venturers, organizational units of any kind, their predecessors,

17   their successors and assigns, and their present officers, directors, employees, agents,

18   representatives and other persons acting on their behalf.

19      Plaintiffs will amend the Complaint or seek leave of the Court to amend the

20   Complaint to name as DOES any or all of these or other companies, once Plaintiffs have

21   discovered which company/companies manufactured and/or distributed the Hormones they

22   ingested.

23      28.    Plaintiffs allege on information and belief that the following companies and

24   others not yet identified manufactured and/or distributed estropipate, and that Plaintiff may

25   have taken estropipate manufactured and/or distributed by them: Barr Labs Inc.; Duramed

26   Pharmaceuticals Inc.; Mylan Laboratories Inc.; Noramco Inc.; Ortho-McNeil

27   Pharmaceutical; Qualitest Pharmaceuticals Inc.; United Research Laboratories Inc.;

28   Watson Pharmaceuticals Inc. a California Corporation, located in Corona California; and

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90402-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-8623

1  Women First HealthCare Inc.

2       The above list is intended to include each company's subsidiaries, divisions,

3  franchises, partners, joint venturers, organizational units of any kind, their predecessors,

4  their successors and assigns, and their present officers, directors, employees, agents,

5  representatives and other persons acting on their behalf.

6       Plaintiffs will amend the Complaint or seek leave of the Court to amend the

7  Complaint to name as DOES any or all of these or other companies, once Plaintiffs have

8  discovered which company/companies manufactured and/or distributed the Hormones they

9  ingested.

10      29.     Plaintiffs also allege on information and belief that one or more chain

11  pharmacies and/or large health care providers and/or health insurance companies, some

12  of which are named above, may have manufactured and/or repackaged and distributed

13  generic hormones. Plaintiffs will seek leave of the Court to amend the Complaint to include

14  any or all of these companies, once Plaintiffs have discovered which company/companies

15  manufactured and/or distributed the drugs they ingested.

16      30.     Plaintiffs are informed and believe, and thereupon allege, that at all times

17  mentioned herein and at the time of filing of this action, the Individual Defendants

18  (Defendant Michelle Luna, and DOES 1 through 50, inclusive, and each of them) were and

19  now are citizens of the State of California and residents of the County of San Francisco,

20  State of California, were and now are employees, servants or ostensible agent, agents, of

21  the Wyeth Defendants, the MPA Defendants, and Defendant DOES 51 through 100,

22  inclusive, and each of them, and were and now are operating out of the County of San

23  Francisco, State of California and the County of Sonoma, State of California.

24                                   III.

25                        **FACTUAL BACKGROUND**

26      **A.     The Marketing of Hormone Therapy**

27      31.     Hormone "Replacement" Therapy or "HT" most commonly refers to the

28  combination of both conjugated estrogens (estrogen) and progesterone (progestin).

- 11 -

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 656-7900
FACSIMILE (310) 458-6823

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 306
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7890
FACSIMILE (310) 458-6523

Estrogen used alone is sometimes known as Estrogen "Replacement" Therapy, "ET," estrogen alone, or estrogen unopposed. HT and ET are prescription therapies provided to women during and after menopause. HT is prescribed to women who have made the natural transition to menopause through the aging process. ET is prescribed to women who have had a surgical menopause through hysterectomy.[1]  In general, hormone therapy is an umbrella term that is used to refer to either the use of combination hormone therapy (that is, estrogen and progesterone) or to the use of estrogen alone.

32.     In the average female reproductive life, the period of menopause can occur from age 51 until death. During menopause, a woman's estrogen level drops sharply. Hot flashes-which for some women are just a vague feeling of warmth, for others, the skin suddenly flushes and beads with sweat, while the pulse races-are a very common symptom of menopause. When estrogen levels drop off, so does calcium in the skeleton. As a result, the risk of osteoporosis and spine, hip, and other fractures goes up.

33.     Menopause is a major issue in the lives of millions of women.  Natural menopause comes at a time when women are relatively young, usually between 46 and 62, when most American women live to an average age of 80. As a result, the consequences of menopause are felt for years after the menopause begins.

34.     Menopause has been described in scientific literature since the late 1800s. By the turn of the 20th century, the search for an aid to maintaining the youth, health, sex, and vitality of women was widely pursued. The increasing awareness of the effects of menopause made a drug to "cure" menopause a blockbuster drug waiting to happen. In 1942, Ayerst, the predecessor to the Wyeth Defendants, received approval for the patent of that blockbuster, Premarin, a mix of estrogens extracted from the urine of pregnant mares.

35.     The same year the predecessor to the Wyeth Defendants patented Premarin

---

[1]     Estrogen therapy is prescribed to women who have any one of three types of hysterectomy:  *subtotal* (where only the uterus is removed and the ovaries and cervix remain intact); *total* (where both the uterus and cervix are removed but the ovaries remain), or *total plus oopherectomy* (where at least one ovary is removed along with the uterus and cervix).

- 12 -

1   it also received FDA approval. Premarin was marketed early on as "Replacement" therapy

2   because it "replaced" the estrogens that began to disappear from a woman's body.

3       36.     The Wyeth Defendants have vigorously promoted its .hormone therapy

4   products - using marketing efforts directed to physicians and programs intended to reach

5   consumers directly (i.e., "direct-to-consumer" or "DTC" marketing). The intention of

6   Wyeth's marketing efforts was to create a lifelong demand for its hormone therapy drugs

7   and a willingness by physicians to prescribed these drugs to their post-menopausal

8   patients.

9       37.     There are an estimated 50 million post-menopausal women in the United

10  States. Menopause is a natural condition and process and not a disease. In July 2002,

11  approximately 38% of postmenopausal women in the United States used estrogen or

12  hormone replacement therapy, including approximately six million American women who

13  were taking Prempro.

14      38.     The Wyeth Defendants' DTC efforts have included overt advertising pieces,

15  such as print advertisements, videotapes, and brochures directed to consumers, as well

16  as "product placement" efforts in which hormone therapy drugs are favorably positioned

17  in entertainment vehicles or favorably described in the popular press by hired

18  speakespersons. In 1999, the Wyeth Defendants spend $34.7 million on DTC advertising

19  for Prempro, one of its hormone therapy drugs.  In 2000, Wyeth spent $37.4 million on

20  Prempro DTC advertising.

21      39.     Wyeth's hormone therapy drugs, Prempro and Premarin, were designed and

22  have been approved by the FDA only to relieve menopausal symptoms, such as hot flasks

23  and vaginal atropy, and osteoporisis. The Wyeth Defendants, however, have long touted

24  additional benefits for their hormone therapy drugs, beyond these FDA-approved uses.

25      40.     Wyeth marketing hormone therapy marketing efforts have a long history. In

26  1962, a Brooklyn, New York, gynecologist, Dr. Robert Wilson, wrote an article, also

27  appearing in the Journal of the American Medical Association (JAMA), that claimed taking

28  estrogen during menopause reduces breast and genital cancers. Then, in 1966, Dr. Wilson

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 100
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

wrote his bestseller entitled Feminine Forever. In it, Dr. Wilson recommended estrogen as the "cure" for "the tragedy of menopause." He argued that women who use the drugs "will be much more pleasant to live with and will not become dull and unattractive." In writing about the menopause condition, which he termed the "deficiency disease," Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent.. . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair. . . Estrogen makes women adaptable, even-tempered, and generally easy to live with." Dr. Wilson asserted that estrogen prevents breast and genital cancers, such as endometrial cancer (i.e., cancer of the uterine lining).

41.     The FDA later said that Dr. Wilson's recommendations went beyond approved use for hormone therapy and that it would no longer accept his data. However, soon after the publication of Dr. Wilson's book, the Wyeth Defendants' sales force began to distribute the book to physicians throughout the country. The Wyeth Defendants poured thousands of dollars into Dr. Wilson's research. The Wyeth Defendants ran ads in medical journals that read: "Treat her with Premarin. Keep her on Premarin." Following Dr. Wilson's publications, sales of Premarin quadrupled. By the mid-70s more than 30 million prescriptions for Premarin were being written every year, eventually making it the fifth most frequently prescribed drug in the United States.

42.     In 1973, an article appearing in Harper's Bazaar claimed, "There doesn't seem to be a sexy thing estrogen can't and won't do to keep you flirtatiously feminine for the rest of your days . ... a real package deal that spruces up your vagina ... Prevalent medical opinion is that the safety and benefits of ERT have been convincingly demonstrated."

43.     In a print advertisement that the Wyeth Defendants published in the October 13, 1975, edition of JAMA, the Wyeth Defendants claimed that "tension, irritability, headaches, undue fatigue, depression and insomnia," when caused by declining menopausal estrogen levels, may be relieved with Premarin. Additionally, at the top of the advertisement, in large print, Wyeth advised doctors, "Almost any tranquilizer might calm

- 14 -

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

1  her down ... but at her age, estrogen maybe what she really needs."

2      44.    But, by the mid-70s it also became evident that women using estrogen began

3  to show a significant increase of endometrial cancer. In 1976, the first study showing a link

4  between menopausal estrogen and endometrial cancer appeared in the New England

5  Journal of Medicine. Consequently, physicians stopped prescribing Premarin for women,

6  except for those who had hysterectomies and therefore were not at risk for endrometrial

7  cancer. Estrogen sales plummeted and by 1979, the only approved use of estrogen was

8  for treatment of hot flashes and vaginal dryness. The Wyeth Defendants therefore had to

9  come up with a new justification for menopausal women without hysterectomies to continue

10  taking Premarin. In 1980, an article by Dr. Don Gambrell that appeared in the journal,

11  Obstetrics and Gynecology, reported that adding progestin to estrogen led to a decline in

12  endometrial cancer. This progestin (i.e., synthetic progesterone or medroxyprogesterone

13  acetate) was therefore added to the estrogen hormone therapy regimen to protect the

14  uterus.

15      45.    The Wyeth Defendants, as well as the MPA Defendants and DOES 51

16  through 100, have manufactured, marketed, and distributed medroxyprogesterone acetate

17  for use in combination with Premarin under trademarked brand names such as Provera

18  and Cycrin and as generic equivalents.

19      46.    In 1985, the Wyeth Defendants developed another spin on the marketing of

20  hormone therapy drugs, claiming that the drugs could help prevent bone loss. The Wyeth

21  Defendants hired a public relations firm to create public awareness of osteoporosis and

22  learned that 77% of women never heard of osteoporosis. As a result, the Wyeth

23  Defendants' public relations campaign sought to tell women that osteoporosis is a

24  devastating disease and that its estrogen drug, Premarin, could treat it. Soon, their public

25  relations campaign created support for a National Osteoporosis Week and eventually, a

26  National Osteoporosis Foundation (to which the Wyeth Defendants contributed).

27      47.    The Wyeth Defendants also sought to claim that hormone therapy drugs,

28  such as Premarin, could prevent cardiovascular disease. By claiming as the Wyeth

- 15 -

COMPLAINT FOR DAMAGES

1  Defendants did that hormone therapy drugs prevent the biggest killer of all, cardiovascular

2  disease, Premarin could be promoted as recommended treatment for all women. In 1985,

3  the Nurses Health Study was released and the Wyeth Defendants asserted that the study

4  proved this very assertion-hormone therapy prevented cardiovascular disease.

5       48.     The Nurses Health Study, which was based on questionnaires of almost

6  122,000 female nurses, including 32,300 post-menopausal women, suggested that women

7  using hormone therapy were at a lesser risk of developing coronary heart disease. Soon

8  enough, researchers were producing many studies championing the use of hormone

9  therapy to prevent heart disease and bone loss, without the risk of cancer, stroke or blood

10 clots. As a result of the Wyeth Defendants efforts to generate and promote research that

11 supported the conclusion that hormone therapy protected women's cardiovascular system,

12 between 1990 and 1995 Premarin became the most frequently dispensed prescription drug

13 in the United States.

14      49.     The Wyeth Defendants' hormone therapy promotion and marketing efforts

15 overstated the conclusions of the Nurses Study. Researchers were still uncertain of the

16 final assessment of the benefits and risks of hormone therapy. For instance, the Nurses

17 Study was significant in size, but it was not a randomized study where participant results

18 are compared between drug users and participants using placebo, the type of study

19 considered the gold standard in medical research. Moreover, the participants in The

20 Nurses' Study were educated and compliant "patients"-actually nurses-who were more

21 keenly aware of their health conditions and at a lower risk for heart disease regardless of

22 hormone therapy.

23      50.     In addition to Wyeth's research efforts to support its overreaching claims its

24 hormone therapy drugs, the drug maker's marketing juggernaut sailed forward, unimpeded

25 by the lack of scientific support for its claims. For instance, in March of 1998, Wyeth

26 offered a free magazine subscription (to "Seasons" magazine) to women taking its

27 hormone therapy drugs in exchange for submitting personal information to Wyeth on a

28 postcard or by calling a toll-free phone number. Beginning in early 1999, Wyeth also

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 305
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6803

- 16 -

distributed a brochure to women through the waiting rooms of physicians' offices, that claimed, "Menopause isn't gone in a flash - its debilitating consequences can affect the rest of your life." The promotional brochure also directed women to "Take a few minutes to think about the rest of your life" and listed a number of conditions which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease, and colon cancer.

51.    In a magazine advertisement featuring model Lauren Hutton, Wyeth made a rash of similar claims, suggesting that its hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss. In the March 19, 2000, edition of *Parade Magazine*, Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit and she answered: "[M]y number 1 secret is estrogen. It's good for your moods, it's good for your skin. If I had to choose between all my creams and makeup for feeling and looking good, I'd take the estrogen."

52.    A cornerstone of the marketing Wyeth program was promotion of hormone therapy for long-term use of indefinite duration. Specifically, *JAMA* reported that:

> In 2000, 46 million prescriptions were written for Premarin (conjugated estrogens), making it the second most frequently prescribed medication in the United States and accounting for more that $ 1 billion in sales, and 22.3 million prescriptions were written for Prempro (conjugated estrogents plus medroxyprogestrone acetate). While US Food and Drug Administration-approved indications for hormone therapy include relief of menopausal symptoms and prevention of osteoporosis, *long-term use has been in vogue to prevent a range of chronic conditions, especially heart disease.*

(Emphasis added.)

53.    In or around 1993, Wyeth distributed a videotape to consumers entitled, "What every woman should know about estrogen." This videotape claimed to be a

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

"seminar for women" and depicted a female doctor advising women about menopause and hormone therapy. Wyeth's video "seminar" warned of a wide variety of illnesses and ailments purportedly associated with menopause. Among other things, Wyeth represented that estrogen loss causes bones to become "brittle," skin to become "dryer," and sexual intercourse to become "painful and irritating." While Wyeth's video "seminar" was exhaustive in its warnings about menopause, it glossed over the dangers and risks associated with hormone therapy.

54.     In its "What every woman should know about estrogen" video seminar, Wyeth also represented to women that estrogen provided "long term health protection" and should be continued indefinitely, even after short term menopausal symphony, such as hot flashes, had subsided. When a purported consumer inquired how long Premarin should be taken, Wyeth's doctor-spokesperson responded "anywhere from five to ten years in order to get protection from long term problems." And, with regard to breast cancer risks, Wyeth represented to women, through its video "seminar" that the benefits of taking estrogen "far outweigh[ed]" the risks for women unless they faced a particularly high risk of breast cancer.

55.     Faced with the threat of a shrinking market for Premarin because of the end of its patent protection in 1995, the Wyeth Defendants began to develop a combination therapy pill that would combine its super pill, Premarin, with progestin. In 1995, the Wyeth Defendants introduced Prempro, one of the first estrogen-plus-progestin hormone therapy pills approved by the FDA.

56.     Soon after introduction of Prempro, the Wyeth Defendants began funding a four year heart disease prevention trial, called HERS: Heart and Estrogen/Progestin Replacement Study. The Wyeth Defendants had high hopes that HERS would show that hormone therapy prevents heart disease in high-risk women and that, as a result, Prempro would become an FDA-approved drug for heart disease. But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women with heart disease. The Wyeth Defendants' hopes were left to

- 18 -

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6923

1  a very important study underway known as the WHI study or Women's Health Initiative

2  Study.

3       57.    While the Wyeth Defendants waited for the WHI study researchers to collect

4  their data and reach their conclusions, the drug maker's overzealous hormone therapy

5  marketing effort continued. At least until mid-2002, the Wyeth Defendants distributed a

6  hormone therapy promotional brochure targeted for women consumers. Wyeth

7  emblazoned across the front cover of its brochure the words "Starting your Hormone

8  Replacement Therapy (HRT)." At the bottom of the cover and at the bottom of nine of its

9  seventeen pages of text, the following words appear: "Say yes to PREMPRO." The

10 brochure contains testimonial statements from women taking Prempro, such as, "I wanted

11 an HRT that was established, time tested, and had a successful track record. I'm delighted

12 with PREMPRO" and "With PREMPRO, I know I've taken action to protect my health - and

13 that's truly empowering." The unbalanced nature of Wyeth's marketing efforts is typified

14 by the inadequate warnings contained in the "Side Effects" section of Wyeth's "Say yes to

15 PREMPRO" brochure. In the section, the Wyeth Defendants warn about uterine cancer

16 (associated with estrogen-only therapy), worsening diabetes, nausea, abdominal pain,

17 irregular bleeding, headache, hair loss, and breast tenderness.

18      58.    The 2001 Annual Report of the Wyeth Defendants contains a similarly

19 testimonial statement from a Philadelphia woman: "I started taking Premarin after a

20 hysterectomy, and it made an immediate difference in getting me back to normal. *Now,*

21 *more than 15 years later,* I continue to lead an active life." (Emphasis added.)

22      B.    **The WHI and NCI Studies**

23      59.    For years estrogen and progestin hormone therapy were thought to be drugs

24 of prevention. It was originally thought that the prevention of osteoporosis and heart

25 disease were two of the main long-term benefits for taking hormone therapy. The WHI and

26 NCI studies released in July 2002 changed the way doctors and scientists viewed

27 estrogen-not only does estrogen hormone therapy fail to prevent disease, it substantially

28 increases the risk of *causing* disease.

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

60.     There are two studies that form the foundation for the new conclusion that the risks of hormone therapy outweigh the benefits for most women given the present manufacturers' recommendations. The WHI study is reported at Roussow JE, et al., *Risks and Benefits of Estrogen Plus Progestin in Healthy Post-menopausal Women.* (JAMA. 2002 Jul 17; 288:321-33.) The NCI study is reported at Lacey JV Jr., et al., *Menopausal hormone replacement therapy and risk of ovarian cancer.* (JAMA. 2002 Jul 17; 288(3):334-41.)

61.     The Women's Health Initiative (WHI) is a group focused on defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in post-menopausal women. Between 1993 and 1998, the WHI enrolled 161,809 post-menopausal women in the age range of 50 to 79 years into a set of clinical trials and an observational study at 40 clinical centers in the United States. Included within the clinical trials was a study by the National Heart, Lung, and Blood Institute (NHLBI) of the National Institutes of Health (NIH).

62.     Participants in the NHLBI component of WHI, like most women with a uterus who take hormone therapy, were given progestin in combination with estrogen (i.e., combination hormone therapy). The estrogen plus progestin trial of the WHI involved 16,608 women ages 50 to 79 years with an intact uterus. An important objective of the trial was to examine the effect of estrogen plus progestin on the prevention of heart disease and hip fractures, and any associated change in risk for breast and colon cancer. The study did not immediately address the short-term risks and benefits of hormones for the treatment of menopausal symptoms.

63.     Women enrolled in the estrogen plus progestin study were randomly assigned to a daily dose of estrogen plus progestin (0.625 mg of conjugated equine estrogens plus 2.5 mg of medroxyprogesterone acetate) or to a placebo. Those participants receiving the drug (not placebo) received the Wyeth Defendants' drug Prempro. Participants were enrolled in the study between 1993 and 1998 at over 40 clinical sites across the country.

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

COMPLAINT FOR DAMAGES

64.    In 2000 and again in 2001, WHI investigators complied with a recommendation from the study's Data and Safety Monitoring Board (DSMB) to inform participants of a small increase in heart attacks, strokes, and blood clots in women taking hormones. The DSMB, an independent advisory committee charged with reviewing results and ensuring participant safety, found that the actual number of women having any one of these events was small and did not cross the statistical boundary established to ensure participant safety. Therefore, the group recommended continuing the trial due to the still uncertain balance of risks and benefits.

65.    At the DSMB's meeting on May 31, 2002, the data review revealed for the first time that the number of cases of invasive breast cancer in the estrogen plus progestin group had crossed the boundary established as a signal of increased risk. The DSMB's May 31, 2002, recommendation to stop the trial was based on the finding of increased breast cancer risk, supported by the evidence of overall health risks exceeding any benefits. On July 8, 2002 participants started receiving letters informing them about the results and telling them that they should stop study medications.

66.    The WHI Study found that for the estrogen plus progestin group (i.e., those women who took Prempro) compared to placebo, overall there was a:

(i)    41 percent increase in strokes,

(ii)    29 percent increase in heart attacks,

(iii)    a doubling of rates of venous thromboembolism (blood clots),

(iv)    22 percent increase in total cardiovascular disease,

(v)    26 percent increase in breast cancer,

(vi)    a 37 percent reduction in cases of colorectal cancer, and

(vii)    a one-third reduction in hip fracture rates.

67.    The WHI Study concluded that the "Overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2-year follow-up among healthy post menopausal US women." The Study also found that the combination hormone regimen should not be initiated or continued for primary prevention of coronary heart

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 Ocean Avenue, Suite 205
Santa Monica, CA 90401-2103
Telephone (310) 458-7900
Facsimile (310) 458-8823

- 21 -

1    disease.

2        68.    Because of the importance of the report from the WHI investigators on the

3    estrogen plus progestin study, the study was released early to the public on July 9, 2002,

4    as an expedited article on the *JAMA* Web site, In commenting on the studies findings,

5    NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

6        The cardiovascular and cancer risks of estrogen plus progestin outweigh any

7        benefits-and a 26 percent increase in breast cancer risk is too high a price

8        to pay, even if there were a heart benefit. Similarly, the risks outweigh the

9        benefits of fewer hip fractures.

10       69.    Dr. Jacques Roussow, acting director of the WHI and lead author of the

11    JAMA article, summarized the risks of combination hormone therapy in very straightforward

12    manner as he explained the statistical significance of the study results:

13        The WHI results tell us that during 1 year, among 10,000 postmenopausal

14        women with a uterus who are taking estrogen plus progestin, *8 more will*

15        *have invasive breast cancer, 7 more will have a heart attack, 8 more will*

16        *have a stroke, and 18 more will have blood clots, including 8 with blood clots*

17        *in the lungs,* than will a similar group of 10,000 women not taking these

18        hormones. This is a relatively small annual increase in risk for an individual

19        woman. Individual women who have participated in the trial and women in

20        the population who have been on estrogen and progestin should not be

21        unduly alarmed. However, even small individual risks over time, and on a

22        population-wide basis, add up to *tens of thousands of these serious adverse*

23        *health events.*

24    (Emphasis added.)

25       70.    Within a week after the WHI results were reported, another article appeared

26    in JAMA related to the risk of long-term use of estrogen-only therapy. On July 17, 2002,

27    JAMA published a NCI study, which found that women who took estrogen were more likely

28    to develop ovarian cancer than those not on the hormone.

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 300
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 306
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 456-6823

71.     In the study, researchers from the NCI followed 44,241 women for 19 years who were taking estrogen only and found that these women had a 60% higher risk of ovarian cancer than women who had never used estrogen. The risk increased proportionately with longer duration of estrogen use. Women who took estrogen for 10 to 19 years had an 80% higher risk than those who did not take the pills. Those on the hormone therapy for 20 years or more were three times as likely to develop ovarian cancer as women who did not take it at all. Most of the NCI participants used the Wyeth Defendants' brand of estrogen therapy, Premarin.

72.     Lead author of the NCI study, James V. Lacey, summarized the results of his study with the following statement:

> The main finding of our study was that post-menopausal women who used estrogen replacement therapy for 10 or more years were at significantly higher risk of developing ovarian cancer than women who never used hormone replacement therapy.

73.     Dr. Lacey further underscored the implications of his NCI study, by explaining that the findings translate into one or two additional ovarian cancers each year per 10,000 women taking estrogen alone. In 2000, eight million American women took Premarin, the leading estrogen therapy pill. The Lacey study demonstrates that Premarin usage is responsible for up to 1,600 additional ovarian cancer cases in the year 2000 alone.

74.     In October 2003, the WHI Prempro trial produced a report with findings similar to the NCI study regarding ovarian cancer. In the October 1, 2003, issue of JAMA, reported that combination hormone therapy was also associated with increased risk for ovarian cancer: the WHI investigators found that women randomized to received combined hormone therapy (i.e., estrogen plus progestin) experienced a 58% increase in ovarian cancer rates.

C.     **The Aftermath of the WHI and NCI Studies**

75.     Commenting on the WHI study, Dr. Leslie Ford, associate director for clinical

- 23 -

1   research at the NCI's Division of Cancer Prevention, re-emphasized the risk of hormone

2   therapy to patients:

3           The reduction in colorectal cancer risk in the WHI is intriguing, but the

4           balance of harm versus benefit does not justify any woman beginning or

5           continuing to take estrogen plus progestin for this purpose.

6           76.     Dr. Issac Schiff of Massachusetts General Hospital also commented on the

7   WHI study, noting that "Quality of life is very, very important.... From a heart and breast

8   cancer point of view, the drug should be outlawed. But for hot flashes, there's nothing

9   better."

10          77.     Since the WHI and NCI studies were published, additional research has

11  found more support for the unsafe and dangerous adverse effects of hormone therapy.

12  A study on hormone therapy and breast carcinoma risk in Hispanic and non-Hispanic

13  women, reported on September 1, 2002, in the journal Cancer, found that Hispanic

14  post-menopausal women have significantly increased breast cancer risk after long-term

15  hormone therapy.

16          78.     On October 23, 2002, the United Kingdom's Medical Research Council

17  announced that it had ended a clinical study of the risks and benefits of long-term use of

18  hormone therapy for "scientific and practical reasons." 5,700 women were enrolled in the

19  study known as the Women's International Study of Long Duration Oestrogen after

20  Menopause or "WISDOM." The study was to include 22,000 women. Following the WHI

21  study, however, the WISDOM study was canceled. The Medical Research Council

22  concluded that "There is strong evidence that taking hormone therapy long term increases

23  the risks of some diseases such as breast cancer and decreases the risks of others such

24  as osteoporosis."

25          79.     Because of the significance of its findings, on March 17, 2003, the New

26  England Journal of Medicine (NEJM) released a follow-up WHI study two-months in

27  advance of its May 8th publication date. The follow-up study reported that hormone

28  therapy failed to improve the quality of life for menopausal women.

- 24 -

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 200
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-8823

PAUL & JANOFSKY
A PROFESSIONAL CORPORATION
1401 OCEAN AVENUE, SUITE 200
SANTA MONICA, CA 90401-2103
TELEPHONE (310) 458-7900
FACSIMILE (310) 458-6823

80.     The Quality of Life study which examined the same pool of 16,000 women as the July 9, 2002, WHI study, found that hormone therapy drugs do not do the very thing many women took them for in the first place- that is, to make them feel happier and healthier after menopause. A comparison of women who took hormone therapy to women given a placebo showed those women taking hormones did not report sleeping better or feeling better. The hormone therapy group also did not report less depression or more sexual satisfaction than the placebo group.

81.     According to the study's lead author, Dr. Jennifer Hays: "It's just not something that's going to make most women feel better. Even if it reduces your symptoms, that's not going to translate into a meaningful effect on a quality of life." Dr. Deborah Grady of the University of California, San Francisco, in an accompanying commentary in same issue of the NEJM said that: "There is no role for hormone therapy in the treatment of women without menopausal symptoms" and that women who are not experiencing debilitating menopausal symptoms should not take hormone therapy. She stated that those women who do continue with hormone therapy should take the lowest possible dose for the shortest possible time.

82.     On May 21, 2003, JAMA published another study studying the efficacy of estrogen plus progestin therapy (e.g., Prempro) for prevention of bone loss in elderly women. The study involved 373 women ages 65 to 90 who had either thinning bones or full-blown osteoporosis and took one of four treatments for three years: (i) combination hormone therapy alone, (ii) a bone-building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.

83.     While the study found that the combination of hormone therapy and Fosamax was effective at treatment and prevention of post-menopausal osteoporosis, it also concluded that Fosamax alone was more effective than combination hormone therapy alone. After three years, hip bone density had increased nearly 6 percent in women on hormone therapy with Fosamax, 4 percent in those on Fosamax alone, and 3

- 25 -